*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| YELENA R., | ) | |
| | ) | Supreme Court No.  S-15042 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KO-11-00300 CI |
| v. | ) | |
| | ) | O P I N I O N |
| GEORGE R., | ) | |
| | ) | No. 6912 – May 23, 2014 |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Steve W. Cole, Judge.

Appearances: Yelena R., pro se, Taunton, Massachusetts, Appellant.  Elizabeth W. Fleming, Kodiak, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

Yelena R. and George R.[1] were involved in an on-again, off-again relationship for more than a decade and have two children together.  Yelena accused George of sexually assaulting her in May 2011 while they were living together in

_____

[1]     We use pseudonyms throughout this opinion to protect the privacy of family members.

Kodiak. After the Kodiak magistrate found Yelena's testimony unpersuasive and denied her request for a long-term domestic violence protective order, Yelena took the children to Massachusetts without notifying George. A Massachusetts court ordered the children to be returned to Kodiak and this custody case ensued. After a custody trial, the superior court granted sole legal and primary physical custody of the children to George and ordered supervised visitation between Yelena and the children. Yelena now appeals the custody order and visitation restrictions.

This appeal requires us to consider whether the superior court had jurisdiction to make final custody decisions regarding the children, and, if it did, whether the superior court properly: (1) declined to find a history of domestic violence by George; (2) awarded custody to George; and (3) required supervised visitation. We conclude that the superior court had jurisdiction, properly declined to apply AS 25.24.150(g)'s domestic violence presumption, adequately considered AS 25.24.150(c)'s "best interest" factors, and made no clearly erroneous factual findings; thus it did not abuse its discretion by awarding custody of the children to George. It was error for the superior court to require supervised visitation without making adequate findings to support the visitation restrictions and by failing to establish a plan for Yelena to achieve unsupervised visitation. It was also an abuse of discretion to delegate to George the authority to end the supervision requirement. We affirm the superior court's award of custody to George, but remand for further proceedings on the issue of Yelena's visitation.

## II. FACTS AND PROCEEDINGS

### A. Facts

Yelena and George married in October 2000 after Yelena became pregnant. George and Yelena's son, Isaac, was born in January 2001. George joined the Coast Guard in late 2000, and the family moved to California shortly after Isaac was born.

Yelena testified that about five months after they were married, a pattern of reciprocal physical abuse began between her and George.[2] Yelena said that both of them committed acts of domestic violence and were arrested early in their relationship. Yelena was arrested and charged with inflicting corporal injury on a spouse and battery on a spouse in September 2001 in California.[3] She entered a nolo contendere plea and was sentenced to ten days in jail and one year of probation.

George filed for divorce in 2002, and the couple divorced in November 2004 in California. The California court ordered shared legal custody of Isaac and granted primary physical custody to George, with regular visitation to Yelena. The court also granted George's request to move with Isaac from California to North Carolina for work. Despite their divorce, Yelena and George continued their relationship and lived together on and off between 2004 and 2011.

Yelena became pregnant with their daughter Amy in 2005. Yelena alleged that George pushed her down the stairs because he did not want her to have the baby. Amy was born in early 2006. George was then stationed in Massachusetts, and George and Yelena moved back in together and lived with George's mother. Yelena suggested that George's family abused Yelena and Isaac during this time.

In July 2007 while they were living in Massachusetts, Yelena reported that after she found earrings in their bed and placed them in George's hand, he assaulted her by repeatedly punching her in the back while Amy lay in the bed next to her. George told police that he and Yelena had been arguing for several days and that she dropped Amy on him while he was sleeping and then assaulted him by sitting on him, hitting him,

---

[2] Most of the testimony that we reference in this opinion was given late in the case, during an evidentiary hearing on interim custody in May 2012, or at the custody trial conducted over several days in June, August, and September 2012.

[3] There are no factual details concerning these charges in the record.

and swinging an object at him. George was arrested and charged with assaulting Yelena. Yelena went to Cape Cod Hospital in Hyannis later that day, where she reported being punched in the back. She was diagnosed as having a subcapsular hematoma on the left kidney. Yelena voluntarily left the hospital against medical advice.

Yelena moved back in with George three or four months after the alleged assault, around November 2007. On November 8 George was counseled in writing by his Coast Guard commanding officer to reconsider living with Yelena because of the multiple reported altercations between them. George was also counseled that he should not be living with Yelena because she admitted to being "a habitual user of marijuana."

In April 2008 the trial court in Barnstable, Massachusetts entered a stipulated order in which Yelena and George agreed to share legal and physical custody of the children. In May 2008 a Barnstable district court judge dismissed the assault charges against George arising from the July 2007 incident.

From early 2008 until 2010, Yelena and George did not live together but did spend significant time together. During that time George took care of the children most weekends and evenings. George testified that Yelena would not spend her time off with the children, suggesting that she would instead "socialize" and often had a "hangover."

In June 2010, the Coast Guard transferred George to Kodiak. Yelena said that their relationship and co-parenting were good in the period leading up to when George moved. Yelena quit her job around October and in early December moved to Kodiak with the children to live with George. Yelena obtained employment as a victim's advocate at the Kodiak Women's Resource and Crisis Center.

Isaac developed severe dental problems sometime before the move to Kodiak. George claimed that these problems were the result of Yelena's neglect, and that he immediately dealt with them when Isaac arrived in Kodiak. George said that he

first learned about the dental issues shortly before Yelena moved to Kodiak, and that he told her Isaac should have been seen by a dentist before moving. George explained that he immediately took Isaac to the dentist and a series of visits occurred before Isaac was referred to specialists in Anchorage. In April 2011 pediatric dentists at Joint Base Elmendorf-Richardson diagnosed Isaac as having a "cystic lesion that was grossly disfiguring and causing dental and maxillofacial deformity." The lesion was removed in June 2011. The chief of pediatric dentistry stated that "prompt recognition . . . could have significantly lessened the facial deformity and subsequent need for future orthodontic treatment."

Yelena testified that on the morning of May 25, 2011, George came home from work and began kissing her and making sexual advances.[4] She refused, stating "[t]his isn't worth it . . . I'm sleeping with someone else." She further told George "no," "stop," and "please don't," but he continued to sexually assault her. The sexual assault continued for about five minutes and Isaac, then ten years old, came to the bedroom door after the incident and asked if she was "OK."

Isaac, who was 11 at the time of his testimony, testified that he had difficulty remembering specific events from around the time of the alleged sexual assault, but he did recall a specific instance where his father asked him if he wanted to call the police. He heard his mother and father watching television in their room and then heard his mother yelling "stop, stop," and he said she sounded "furious." He stated that he was scared because he thought someone else might have been in the room with his parents.

---

[4] Most of the testimony about the alleged sexual assault was given at a Coast Guard hearing on court-martial charges against George. The superior court admitted the hearing report in full as evidence. No objection was made to the admission of this report, and neither party argues on appeal that the report should not have been considered by the superior court.

When his mother came out of the room she asked him if he was "OK" and he asked her if she was "OK."

Yelena reported the assault to her supervisor at work the next morning. Her supervisor, Rebecca Shields, testified that Yelena did report the incident to her, though she was unable to recall exactly when. Shields stated that she counseled Yelena and advised her of her options.

Yelena applied for an ex parte, short-term domestic violence restraining order on May 25, which the Kodiak magistrate granted. After receiving the temporary restraining order, Yelena did not immediately return to George's home, but instead stayed in a hotel, sometimes accompanied by Charles Wimberly, whom she had been dating. As a result of the temporary restraining order, George was required to vacate his home, which he did. George later stated that during the time the restraining order was in place Yelena was partying and allowing people to stay in his home.

Wimberly testified that Yelena told him about the temporary restraining order obtained against George and that she was scared of George, but he stated that she never told him about the sexual abuse. Paula Bracher, a friend of Yelena's, testified that Yelena told her about the alleged assault several weeks after the incident, but Bracher never observed any abuse or apparent signs of abuse between Yelena and George.

One of George's co-workers and friends, Robert Greenidge, stated that he observed George to be a great father, but had seen Yelena out at bars in town regularly. He stated that in May 2011 he once observed Yelena "blow her top" and "smack" George while a group of people were watching a sporting event. Greenidge also testified that George said Yelena had sexually assaulted him in the past.

In an interview with a Coast Guard investigator, George denied Yelena's allegation that he sexually assaulted her. He stated that Yelena assaulted him in the 2007 incident and that his acts in self-defense may have caused some injuries, but he asserted

that her medical reports were not accurate. George also told the investigator that on three occasions Yelena woke him up by performing nonconsensual oral sex on him.

On June 14, 2011, the Kodiak magistrate denied Yelena's motion for a long-term protective order and dissolved the temporary order. Immediately after the court denied Yelena's request for a long-term protective order, she took the children and went to Massachusetts without notifying George. On June 15 Yelena sent George an email informing him that she had left with the children. She did not disclose her location, but she left a telephone number. In the email, Yelena accused George of being mentally and physically abusive throughout their relationship.

In mid-July 2011 Yelena reported the previous May's alleged sexual assault to the Coast Guard in Boston. The Coast Guard initiated an investigation into the sexual assault allegations that fall. On October 6 the Coast Guard issued a Military Protective Order prohibiting George from contacting Yelena, Isaac, or Amy. The Coast Guard held a probable cause hearing on court-martial charges against George on April 26, 2012. The investigating officer found reasonable grounds to believe that George committed the alleged sexual assault. Although the officer recommended that the charges be forwarded to general court-martial, the Coast Guard ultimately dismissed the charges against George on July 10, 2012.

## B.    Proceedings

Yelena submitted an affidavit to the Taunton, Massachusetts district court on June 22, 2011, stating that she fled with the children because she was not granted a permanent restraining order in Kodiak and was afraid of George. On June 23 the Taunton district court issued a temporary "Abuse Prevention Order" against George. Following a hearing, the court issued a permanent restraining order against George and granted Yelena sole custody of the children.

In Kodiak superior court, George sought to register orders issued in

California in 2004 and in Massachusetts in 2008 that gave him shared custody of the children. Yelena opposed on the basis that the Massachusetts restraining order gave her sole custody. In August 2011 the Kodiak superior court set a hearing for September 30. On September 27 the superior court granted George's request to continue and reset the hearing for January 13, 2012. George also requested that the court modify the orders to grant sole legal and physical custody to him. The court indicated that it would not decide custody modification at the January 13 hearing, but would entertain a request for a custody modification trial after considering George's motion to register the 2004 and 2008 out-of-state custody orders.

On October 11 George submitted a motion and affidavit to the Taunton district court requesting that the court vacate the restraining order against him. He alleged that Yelena's request for a permanent restraining order in Alaska was denied because of credible testimony that Yelena, not he, was violent and a risk to the children. He further alleged that Yelena kidnapped the children and stole belongings from his home. His motion and a subsequent motion to reconsider were denied.

On November 1, 2011, George filed a custody modification complaint in the Barnstable, Massachusetts trial court. The court found that Alaska had "home state" jurisdiction because the children had lived in Alaska for six months before they were taken to Massachusetts. The court also found that George's "testimony at [the] hearing was far more credible than [Yelena's]." The court entered an emergency order vacating the Taunton district court's July 7 restraining order, granting temporary custody to George, and directing Yelena to return to Alaska with the children.

On January 13, 2012, the Kodiak superior court confirmed the validity of the November 2011 Massachusetts custody order and granted temporary custody to George. On April 12 the Kodiak superior court issued an order denying Yelena's motion for expedited consideration and granting continued temporary custody to George until

an interim custody hearing could be held in May. On May 2 George moved to reschedule the interim custody hearing scheduled for May 10 because the Coast Guard investigation would not be completed at that time. The court denied the motion and held the interim custody hearing on May 10. At that hearing, the court granted continued temporary custody to George and scheduled a custody trial.

The superior court held a custody trial beginning on June 19, 2012. Yelena was scheduled to have visitation with the children that day, and the court held a visitation hearing because Isaac was unwilling to visit with Yelena. Isaac was extremely upset when he was told that he would be visiting with his mother that day. The court ordered that visitation occur, but stated Isaac could leave if necessary. The trial continued on August 2, August 29, and September 20, 2012.

On January 24, 2013, the superior court issued a final order and judgment granting primary physical and sole legal custody to George and ordering supervised visitation with Yelena. The superior court found that Alaska had jurisdiction over the parties and the children under the Uniform Child Custody and Jurisdiction Enforcement Act (UCCJEA).[5] The court explained that it based its custody decision on consideration of the best interest factors as required by AS 25.24.150(c). Because the children would be living with George in Alaska and Yelena lived in Massachusetts, the court ordered telephone or internet visitation to occur twice weekly between Amy and Yelena, and ordered George and Yelena to arrange supervised in-person visitation. The court stated that visitation could begin with Isaac when his counselor said he was ready. The court ordered in-person visitation to be supervised until George reasonably believed supervision was no longer necessary. The court expressed that it would be ideal if the children could eventually spend the majority of the summer with Yelena; it also implied

---

[5]     Codified as AS 25.30.300-390.

that shared physical custody was denied because the parties lived far apart.  Yelena appeals.

## III.    STANDARD OF REVIEW

"Trial courts have broad discretion in determining whether a proposed child-custody modification is in the child's best interest."[6] We will not reverse a custody decision unless the superior "court has abused its discretion or the controlling factual findings are clearly erroneous."[7] Abuse of discretion in child custody cases occurs when the superior court "considers improper factors in determining custody, fails to consider statutorily mandated factors, or assigns disproportionate weight to certain factors while ignoring others."[8] A factual finding is clearly erroneous if, after reviewing the record, we are left "with the definite impression that a mistake has been made."[9]

We review visitation orders for abuse of discretion.[10]  "Whether the superior court applied the correct legal standard is a question of law that we review de novo, adopting the rule of law that is most persuasive in light of precedent, reason[,] and policy."[11] We review challenges to jurisdiction de novo.[12]

---

[6]    *Heather W. v. Rudy R.*, 274 P.3d 478, 481 (Alaska 2012) (quoting *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011)) (internal quotation marks omitted).

[7]    *Iverson v. Griffith*, 180 P.3d 943, 945 (Alaska 2008) (citing *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002)).

[8]    *Id.*

[9]    *Osterkamp v. Stiles*, 235 P.3d 178, 183 (Alaska 2010) (citing *In re Adoption of Missy M.*, 133 P.3d 645, 648 (Alaska 2006)).

[10]    *Faro v. Faro*, 579 P.2d 1377, 1379 (Alaska 1978) (citing *Curgus v. Curgus*, 514 P.2d 647, 649 (Alaska 1973)).

[11]    *Rego*, 259 P.3d at 452 (quoting *McQuade v. McQuade*, 901 P.2d 421, 423 (continued...)

## IV.   DISCUSSION

### A.   The Superior Court Had Jurisdiction Under The UCCJEA.

Yelena argues that the superior court erred by allowing "forum shopping." She alleges that the Barnstable, Massachusetts court erred by issuing a temporary custody order and vacating the Taunton, Massachusetts court's permanent restraining order against George, which granted custody of the children to her.  Her argument implies that the Kodiak superior court lacked jurisdiction and thus improperly enforced the Barnstable, Massachusetts court's order.

Both Alaska and Massachusetts have adopted the initial jurisdiction requirements of the UCCJEA,[13] under which a court has jurisdiction to make a child custody determination if the "state was the home state of the child within six months before the commencement of the proceeding and the child is absent from [the] state but a parent or person acting as a parent continues to live in [the] state."[14]  "A child's home state is the state where the child has lived with his parent or person acting as a parent for six consecutive months immediately before the commencement of the proceeding."[15]

The Alaska court, not the Massachusetts courts, had home state jurisdiction in this case.  The children lived in Alaska from December 14, 2010 until June 14, 2011,

---

[11](...continued)
n.3 (Alaska 1995)) (internal quotation marks omitted).

[12]    *Atkins v. Vigil*, 59 P.3d 255, 256-57 (Alaska 2002).

[13]    *See* AS 25.30.300; MASS. GEN. LAWS ch. 209B § 2 (not expressly adopting UCCJEA, but using functionally identical language); UNIF. CHILD CUSTODY JURISDICTION & ENFORCEMENT ACT § 201 (1997).

[14]    AS 25.30.300(a)(2); *see also* UNIF. CHILD CUSTODY JURISDICTION & ENFORCEMENT ACT § 201(a)(1); MASS. GEN. LAWS ch. 209B § 2(a)(1).

[15]    *Atkins*, 59 P.3d at 257 (citing 28 U.S.C. § 1738A(b)(4)).

exactly six months. Thus, Alaska was the children's home state when George commenced this action in August 2011. Though the Taunton, Massachusetts court may have had emergency jurisdiction to issue a domestic violence protective order that could have granted custody to Yelena,[16] that order was subsequently vacated by another Massachusetts court and thus had no continuing legal effect. Notably, Yelena did not appeal the Massachusetts court order that vacated the earlier permanent restraining order, which granted custody to Yelena. Under the circumstances, the Alaska superior court did not err in concluding it had jurisdiction to hear and decide the custody case.

## B. The Court Did Not Abuse Its Discretion By Awarding Primary Physical And Sole Legal Custody To George.

Yelena alleges error in a number of the superior court's specific factual findings and legal conclusions. These arguments are discussed below. Because the court properly declined to apply AS 25.24.150(g)'s domestic violence presumption, carefully considered and properly weighed the statutory best interests factors, and correctly applied the law, the superior court did not abuse its discretion by awarding primary physical and sole legal custody of Isaac and Amy to George.

### 1. The superior court did not err by declining to apply the domestic violence presumption.

The superior court concluded that the evidence did not support a finding of domestic violence against either party, and thus it did not apply AS 25.24.150(g)'s domestic violence presumption. Yelena argues that the superior court erred by failing

---

[16] *See* AS 25.30.330(a) ("A court . . . has temporary emergency jurisdiction if the child is present in [the] state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subject to or threatened with mistreatment or abuse."); MASS. GEN. LAWS ch. 209B § 2(a)(3) (temporary emergency jurisdiction). The Barnstable, Massachusetts court found that it had emergency jurisdiction, but that Alaska had home state jurisdiction.

to apply the presumption because George has a history of domestic violence and is therefore forbidden from having custody under AS 25.24.150(g) and (h). George responds that the superior court's finding was "overwhelmingly supported by the record."

Alaska Statute 25.24.150(g) provides: "There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child." "A parent has a history of perpetrating domestic violence . . . if the court finds that, during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence."[17] Where a court makes a finding of domestic violence, it must additionally determine whether the domestic violence requires application of the presumption.[18]

Whether the court's findings on domestic violence are supported by the record is a question of fact which we review for clear error.[19] But whether the court used the proper legal standard for applying the domestic violence presumption — including whether the court's findings support applying the presumption — is a question of law, which we review de novo.[20]

---

[17]     AS 25.24.150(h).

[18]     *Puddicombe v. Dreka*, 167 P.3d 73, 77 (Alaska 2007) ("[W]hen the record shows that domestic violence has occurred and the court so finds, it is plain error for the court not to make findings as to whether the domestic violence amounted to a history of perpetrating domestic violence.").

[19]     *Misyura v. Misyura*, 242 P.3d 1037, 1039, 1041 (Alaska 2010).

[20]     *See Rego v. Rego*, 259 P.3d 447, 452, 460-61 (Alaska 2011) (reviewing de

(continued...)

The superior court's domestic violence findings were not clearly erroneous.[21] Yelena and George gave conflicting accounts of the alleged 2007 and 2011 assaults, and both have a long history of alleging abuse against the other. Because of this contradictory evidence, weighing the evidence and evaluating credibility — a function properly left to the trial court[22] — was particularly important. In this case, trial courts in both Alaska and Massachusetts expressed doubts about Yelena's credibility. It is also significant that no court made an evidence-based finding of domestic violence or sexual abuse by George following a trial at which George was present and able to testify and cross-examine Yelena. A review of the facts reveals that: criminal charges arising out of the 2007 and 2011 allegations were dismissed; the Kodiak magistrate did not grant Yelena's petition for a long-term domestic violence protection order against George in June 2011; and the ex parte permanent restraining order granted in Taunton,

---

[20](...continued) novo whether the superior court applied the proper legal standard in considering the provisions of AS 25.24.150); *Zaverl v. Hanley*, 64 P.3d 809, 820 n.29 (Alaska 2003) ("Whether a violation of law gives rise to a legal presumption is a question of law which we review de novo." (citations omitted)); *cf. Rockney v. Boslough Constr. Co.*, 115 P.3d 1240, 1242 (Alaska 2005) (citing *Kirby v. Alaska Treatment Ctr.*, 821 P.2d 127, 129 n.5 (Alaska 1991)) (reviewing applicability of statutory presumption of compensability in workers' compensation proceedings as a question of law).

[21] The superior court did err by concluding that Yelena's 2001 conviction was too dated to consider when evaluating the domestic violence presumption. There is no express time limit on the relevance of past acts of domestic violence under AS 25.24.150(h), and because the court found that Yelena committed an act of domestic violence, it was clear error not to consider whether that finding required application of the domestic violence presumption. *Puddicombe*, 167 P.3d at 77. But because the court did not abuse its discretion by awarding primary physical and sole legal custody to George, and because a single incident of domestic violence does not automatically constitute a history of domestic violence, AS 25.24.150(h), the error is harmless.

[22] *See, e.g.*, *Nancy M. v. John M.*, 308 P.3d 1130, 1133 (Alaska 2013).

Massachusetts was vacated by another Massachusetts court. Based on these facts, and given the court's credibility findings, the superior court did not clearly err by finding that George did not have a history of domestic violence. Further, the superior court clearly considered the evidence of domestic violence in the context of the best interest factors as required under AS 25.24.150(c)(6) and (7) and found that the evidence was insufficient to support Yelena's allegations.

Because the superior court found that George did not have a history of domestic violence, and that finding is supported by the record, we conclude that the court properly declined to apply the domestic violence presumption.

### 2. The superior court properly considered AS 25.24.150(c)'s best interest factors.

Yelena argues that court's best interest findings are not supported by the evidence and that the court abused its discretion in making its custody decisions.

"Alaska Statute 25.24.150(c) requires the superior court to base its custody rulings on the child's best interests and lists nine potentially relevant factors that the court must consider . . . ."[23] The best interests factors include:

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable,

---

[23] *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013) (quoting *Park v. Park*, 986 P.2d 205, 206 (Alaska 1999)) (internal quotation marks omitted).

satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.[24]

Under factor one, the superior court found that Isaac and Amy generally had typical physical, emotional, religious, and social needs for children their age. But the court noted that Isaac was having difficulty with his mother and was confused by Yelena and George's relationship. The court stated, "Isaac seems to be psychologically and emotionally traumatized" and needs counseling.

Under factor two, the superior court found that both parents were capable, "for the most part," of meeting the children's needs. But the court observed that "Isaac had terrible complications from what seems to have been the lack of proper dental care." The court concluded that George was better able to meet the children's physical and emotional needs at the time of the trial. The court did not find Yelena's claims that George had "poisoned the children against her" credible.

---

[24]     AS 25.24.150(c).

Under factor three, the superior court found that the children were not old enough for the court to consider their preferences.

Under factor four, the court found that both parents loved each child.

Under factor five, the superior court found that stability weighed towards keeping the children with George, where they had been living for the past year.

Under factor six, the court found that neither parent seemed willing to encourage a relationship with the other, but that George was somewhat more willing to facilitate a relationship than Yelena. The court weighed the fact that Yelena took the children to Massachusetts without notice against her. The court noted that it could not consider willingness to facilitate a relationship if one parent showed that the other had committed sexual assault or domestic violence against the other parent or the children.

Under factor seven, the superior court found no credible evidence of domestic violence or sexual assault, child abuse, or neglect. The court stated that it took the sexual assault accusations very seriously, but that "these accusations are not supported by the evidence." The court further stated, "I find myself agreeing with [the Barnstable, Massachusetts judge] that, simply put, George is a much more credible witness than Yelena." But the court did note concern about Yelena neglecting Isaac's dental care.

Under factor eight, the court found no credible evidence that either party had substance abuse issues that could affect the well-being of the children.

The court declined to consider any additional factors.

Having carefully reviewed the record, we conclude the superior court's findings are supported by the record and are not clearly erroneous. The court considered all statutory best interest factors and did not abuse its discretion in awarding primary physical and sole legal custody to George.

**3.    The superior court did not abuse its discretion by considering the fact that Yelena took the children to Massachusetts without George's consent.**

Yelena argues that the superior court erred by finding that she improperly took the children from Alaska. She suggests that she was justified in taking the children to Massachusetts because George sexually assaulted her and she feared for her life. The superior court considered Yelena's taking the children to Massachusetts against her under AS 25.24.150(c)(6). The court suggested that taking the children to Massachusetts without informing George was evidence of a lack of willingness to include George in the children's lives.

In *Stephanie W. v. Maxwell V.*, we held that the superior court must not penalize a parent for lack of willingness to facilitate a relationship between a child and the other parent based on a good-faith allegation of sexual abuse of the child, unless that parent "has continued [an] unwillingness to facilitate such a relationship in the period after the superior court made [an] evidence-based finding that [the other parent] had not abused [the child]."[25] Yelena alleges that she fled from Kodiak because of George's abuse. But we do not need to consider whether our reasoning in *Stephanie W.* extends to a parent fleeing with the children based on a good-faith fear for the children's safety following allegations of domestic violence against the other parent because, in this case, Yelena took the children to Massachusetts *after* the magistrate found that the evidence did not support issuing a long-term protective order against George. Thus, *Stephanie W.* is inapposite to the facts in this case.

The record supports the superior court's finding that Yelena removed the children to Massachusetts without notifying George, and that the removal occurred after a court found Yelena's allegations unsubstantiated. These facts are relevant to analyzing

---

[25]    274 P.3d 1185, 1191 (Alaska 2012).

Yelena's willingness to facilitate a relationship between the children and George, and our precedent does not preclude consideration of this evidence. Thus, we conclude that the superior court did not abuse its discretion by weighing the fact that Yelena took the children to Massachusetts against her under AS 25.24.150(c)(6).

### 4. Other issues

Yelena makes a number of other arguments, none of which have merit.

#### a. The superior court did not abuse its discretion by granting extensions.

Yelena argues that the superior court erred by granting multiple extensions. George responds that the orders granting extensions were not final orders, and therefore are not appealable.

An order granting an extension or continuance is ordinarily not appealable because it is not a final order.[26] Interlocutory review of such orders may be available under the circumstances described in Alaska Appellate Rule 402.[27] In this case, however, Yelena is not seeking interlocutory review of an order granting a continuance, she is challenging a final custody order. To the extent she argues that time extensions prejudiced the final judgment, her claim is reviewable for abuse of discretion.[28]

---

[26] *See* Alaska R. App. P. 202.

[27] Appellate Rule 402 allows a party to petition for review of an otherwise non-appealable order or decision where postponement of review: (1) "will result in injustice"; (2) where "[t]he order or decision involves an important question of law on which there is substantial ground for difference of opinion," and immediate review may advance termination of the litigation or is important to the public interest; (3) where the trial court has "so far departed from the accepted and usual course of judicial proceedings" that review is necessary; or (4) where "[t]he issue is one which might otherwise evade review."

[28] *Nielsen v. State*, 623 P.2d 304, 307 (Alaska 1981) (citations omitted) ("The

(continued...)

The superior court ordered two continuances over the course of the litigation in this case. The court granted George's unopposed motion to continue the hearing on registering the out-of-state custody orders, moving the hearing from September 30, 2011, to January 13, 2012. The court also granted George's motion to continue the July 3 trial date because George had recently hired counsel, who needed additional time to prepare. Yelena opposed this motion, arguing that it was a stalling tactic to keep her away from the children. The court moved the trial date to August 2. There is no evidence that this one-month extension prejudiced Yelena. On the other hand, the court denied George's motion, which Yelena opposed, to reschedule a May 10 interim custody hearing to allow the Coast Guard to complete its investigation.[29]

Yelena did not oppose or object to the first continuance, so she is precluded from arguing error on appeal.[30] With respect to the motion she did oppose, the court did not abuse its discretion.

### b. The superior court did not abuse its discretion by declining to appoint a custody investigator.

Yelena argues that the superior court erred by declining to appoint a court custody investigator or guardian ad litem. George responds that neither party moved for

---

[28](...continued) decision whether to grant or deny a motion for continuance is committed to the sound discretion of the trial court . . . ."); *see, e.g.*, *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011) (applying abuse of discretion standard to denial of a request for a continuance in a civil case).

[29] There is no order denying the motion to reschedule in the record, but the hearing proceeded on May 10, 2012.

[30] *See D.A.W. v. State*, 699 P.2d 340, 342 (Alaska 1985) ("A party may not raise for the first time on appeal an alleged error to which he failed to object to in the trial court." (quoting *Chugach Elec. Ass'n v. Lewis*, 453 P.2d 345, 349 (Alaska 1969))).

these appointments.

At an interim custody hearing, Yelena orally requested that the superior court appoint a court custody investigator. The court denied her request, explaining that the custody office was busy and it was likely no one would be able to meet with them until the fall. Neither party filed a written motion to appoint a custody investigator.

A trial judge has discretion whether to appoint a custody investigator,[31] and here the court permissibly exercised its discretion not to appoint one. We conclude that the superior court's decision not to appoint a custody investigator was not an abuse of discretion.

### c. The superior court did not clearly err by finding that Yelena failed to provide proper dental care for Isaac.

Yelena argues that the superior court erred by finding that she neglected to provide proper dental care for Isaac. She asserts that she obtained Coast Guard medical screenings for the children before moving to Kodiak and that they showed no chronic dental conditions. George disputes the credibility of the Coast Guard medical screening documents that Yelena provided.

It is not clear from the record when the cyst on Isaac's face first appeared. George testified that the cyst was already present when Isaac arrived in Kodiak. The superior court admitted the Coast Guard medical screening documents at trial, and there is no apparent basis to conclude that they are not credible. But the documents are not particularly helpful. They simply contain a checked box indicating that the person conducting the examination found no dental problems. And it is not clear when the examination occurred or how extensive it was. The documents in the record do not show any treatment before April 28, 2011, when pediatric dentists at Joint Base

---

[31] Alaska R. Civ. P. 90.6.

Elmendorf-Richardson diagnosed Isaac as having a "cystic lesion that was grossly disfiguring and causing dental and maxillofacial deformity." But George stated that he took Isaac to the dentist immediately after Isaac arrived in Kodiak and a series of visits occurred before Isaac was referred to the specialists in Anchorage.

Though there is arguably conflicting evidence regarding whether the cyst was present when Isaac moved to Kodiak, it is the trial court's role to weigh evidence and evaluate credibility,[32] and George's testimony is sufficient to support the superior court's finding. Because the finding is supported by the record, we conclude that the superior court did not clearly err by finding that Yelena neglected Isaac's dental care.

> **d.** **The superior court did not clearly err by finding that Isaac was "traumatized" by seeing his mother.**

Yelena argues that the superior court erred by finding that Isaac was "traumatized" by his visit with her in June 2012. Because the court's finding is supported by testimony at the hearing after Isaac was unwilling to visit with Yelena, we conclude that the court did not clearly err.

> **e.** **The superior court did not clearly err by finding that George lived in North Carolina at one time.**

Yelena argues that the superior court erred by finding that George lived in North Carolina at one time. Whether George ever lived in North Carolina appears to be irrelevant to the outcome of this case. But, in any case, the finding was not clearly erroneous: A California court granted George permission to move to North Carolina with Isaac in 2004, and Yelena acknowledged that George was in North Carolina for at least some period of time.

---

[32] *E.g.*, *Nancy M. v. John M.*, 308 P.3d 1130, 1133 (Alaska 2013).

C. **It Was Error To Order Supervised Visitation Without Adequate Findings; It Was An Abuse Of Discretion To Fail To Specify A Plan For Achieving Unsupervised Visitation.**

Yelena argues that the superior court abused its discretion by ordering supervised visitation at George's discretion. The superior court's order did not give George discretion whether to allow visitation — it required regular telephone or internet visitation and occasional in-person visitation — but the order did require in-person visitation to be supervised until George decided supervision was no longer necessary.

We review orders setting visitation for abuse of discretion.[33] "[T]he best interests of the child standard normally requires unrestricted visitation with the noncustodial parent."[34] We have held that where a court deviates from this norm by requiring supervised visitation, the decision "must be supported by findings that 'specify how unsupervised visitation will adversely affect the child's physical, emotional, mental, religious, and social well-being.' "[35] Because that requirment is derived from the superior court's statutory obligation to consider certain factors when setting visitation terms, whether the court made the required findings to support supervised visitation is a question of law.[36]

_____

[33]    *Faro v. Faro*, 579 P.2d 1377, 1379 (Alaska 1978) (citing *Curgus v. Curgus*, 514 P.2d 647, 649 (Alaska 1973)).

[34]    *J.F.E. v. J.A.S.*, 930 P.2d 409, 413 (Alaska 1996) (citing AS 25.20.060(c)).

[35]    *Fardig v. Fardig*, 56 P.3d 9, 14 (Alaska 2002) (quoting *J.F.E.*, 930 P.2d at 413-14) (finding that mother's drug use was detrimental to children's well-being was supported by psychologist's testimony and was sufficient to support supervision requirement).

[36]    *J.F.E.*, 930 P.2d at 413 (holding that in ordering visitation, superior court must consider AS 25.24.150's best interests factors, the legislative intent favoring "frequent continuing contact with both parents" expressed in AS 25.20.060, and the

(continued...)

Because Yelena previously left the state with the children without notifying George, and because of Isaac's reaction to his visit with Yelena, supervised visitation may be appropriate. But it was error for the superior court not to make express findings that specified why unsupervised visitation would adversely affect the children's well-being. The court implied that because Yelena had left with the children before, there was a risk that she would take the children again, and the court suggested that contact with Yelena could be psychologically damaging to Isaac. These implications and suggestions are insufficient to support visitation restrictions.[37]

Moreover, when a court orders supervised visitation, the court ordinarily should "specify a plan by which unsupervised visitation can be achieved."[38] The superior court has discretion to establish a plan for ending supervised visitation that is appropriate under the facts of a particular case.[39] But absent a compelling reason to the

---

[36](...continued) "right and responsibility of reasonable visitation" articulated in AS 47.10.84(c)). We note, however, that where a trial court makes the required findings, whether those findings support a particular restriction on visitation is left to the trial court's discretion.

[37]    *See id*. at 412-13 (holding that a finding that a child's nightmares were reported to be worse after visiting with her father and a finding that implied acceptance of "a psychologist's statement that [the child] has increased anxiety and sexual acting out after visits with her father" were not sufficient to support a supervision requirement because they did not specify how unsupervised visitation would adversely affect the child's well-being).

[38]    *Monette v. Hoff*, 958 P.2d 434, 437 (Alaska 1998); *see also Fardig*, 56 P.3d at 14-15.

[39]    *See Fardig*, 56 P.3d at 14-15 (plan was sufficient where the superior court would consider unsupervised visitation on motion after the parent "under[went] a rigorous clinical assessment showing she was clean and sober"); *J.F.E.*, 930 P.2d at 414 (if on remand the superior court found supervision to be necessary, it "should consider
(continued...)

contrary that is supported by the record, the court must establish a plan or criteria for ending the supervision requirement.[40] And the plan may not delegate authority to impose a visitation restriction to one of the parties.[41]

Here it was an abuse of discretion (1) to fail to specify a plan by which unsupervised visitation could be achieved, and (2) to order supervised visitation until George reasonably believed supervision was no longer necessary. This effectively delegated to George the decision whether to impose a condition on visitation. As the superior court expressed in its decision, under ideal circumstances in the future, the children will spend a significant portion of the year with Yelena unsupervised. On remand the superior court should consider how to create an appropriate roadmap potentially leading to unsupervised visitation. The plan may include periodic hearings, advice of professional counselors, a gradual reduction in supervision as long as some condition is met, or any number of other options, but it may not be left to the discretion of one of the parents.

---

[39](...continued)
whether to order periodic reviews of the continuing need for the restriction and whether to establish criteria which might signal the end to the need for the restriction."); *Monette*, 958 P.2d at 437 (superior court's order requiring supervised visitation for a period of three years, after which the mother could seek modification, was appropriate where mother had a history of hiding the child from the father and evidence suggested extended contact with her could cause psychological damage).

[40]    *See Monette*, 958 P.2d at 437.

[41]    *See Misyura v. Misyura*, 242 P.3d 1037, 1041-42 (Alaska 2010) (concluding that the superior court erred by giving one parent discretion whether to require the other parent to attend a batterers' intervention program in order to have visitation with their children).

## V.    CONCLUSION

For the forgoing reasons we AFFIRM the superior court's award of primary physical and sole legal custody to George, and we REMAND for further proceedings on visitation consistent with this opinion.